Cite as 2023 Ark. App. 590

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CR-23-126

| | | |
|---|---|---|
| JONATHAN CHATMAN | | Opinion Delivered December 13, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-20-1193] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE TROY B. BRASWELL, JR., JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**CINDY GRACE THYER, Judge**

Appellant Jonathan Chatman was charged with capital murder in the death of seventeen-month-old Minor Child (MC). A Faulkner County jury convicted him of second-degree murder and sentenced him to thirty years in the Arkansas Department of Correction. On appeal, Chatman does not challenge the sufficiency of the evidence supporting his conviction. Instead, he argues that the circuit court erred in allowing the State to introduce specific rebuttal testimony. We find no error and affirm.

On December 8, 2020, Jayriana Edgerson left her daughter, MC, with Chatman while she went to run some errands. She was gone approximately forty-five minutes to an hour. When she came home, MC was lying on the bed, unresponsive; Chatman was sweating; there was a hole in the living room wall; and the bathroom sink had been broken. Chatman told her that MC had choked on a grape and had been throwing up. Edgerson took her

daughter to Conway Regional Medical Center, where she told the doctors MC had choked on a grape. After reviewing a CT scan of MC's skull, which indicated a skull fracture, medical staff informed Edgerson that the choking scenario was not possible.

Because of the skull fracture, Conway Regional staff made arrangements to have MC taken by helicopter to Arkansas Children's Hospital in Little Rock. Once there, pediatric neurosurgeon Dr. Gregory Albert performed surgery to attempt to relieve the swelling on MC's brain. Sadly, the surgery was unsuccessful, and MC succumbed to her injuries.

Chatman was arrested as he arrived at Children's in Little Rock. He first gave a statement to Sergeant Timothy Gray. Chatman told Gray that MC fell out of her bed and hit the back of her head. According to Chatman, she then went to the living room, where she played with her toys for a while. Chatman said he went to the restroom, and when he came out, MC was leaning against the couch. Chatman picked her up and put her back in bed, then he returned to the living room. Five or ten minutes later, he heard her choking. He ran to the bedroom, where he saw that she had vomited. Chatman said there were grapes on the bed next to her, so he thought she was choking on a grape; he turned MC over on her stomach and began patting her on the back. He then undressed her and stripped the bed so he could wash the soiled clothing and linens. Edgerson returned home shortly thereafter, and they took MC to Conway Regional. Gray asked how MC could have sustained a skull fracture if what Chatman said was true, but Chatman denied that anything had happened other than MC's falling out of bed and hitting her head.

A few hours after his first statement, Chatman gave another statement to Detective Brittani Little. He told her essentially the same story that he had told Gray. Little eventually interjected by informing Chatman that she had spoken to the doctors, who told her there had been "a force that hit [MC's] head" and that her injuries could not have been caused by falling off a couch or a countertop. Chatman denied hitting MC in the head. Little also asked about the broken sink, and although Chatman acknowledged breaking it, he denied that MC was in the bathroom with him when it happened. Chatman repeatedly denied hitting or punching MC, wrestling with her, or being upset with her.

In a second statement to Sergeant Gray, Chatman vehemently denied hitting, kicking, or touching MC or doing anything to cause her harm or cause her death. He said that the only time he touched her was to pick her up and put her back into bed.

An autopsy revealed that MC's death was caused by multiple blunt-force head injuries. Those injuries included a Y-shaped comminuted fracture of her right parietal skull bone; hemorrhaging and contusions to the right temporal lobe of her brain; and edema of her brain. The medical examiner explained that it would take an extreme amount of force to cause a comminuted fracture to a baby's skull, adding that a fall from a three-foot-high bed, for example, would be unlikely to cause such an extensive fracture.

Dr. Karen Farst, an expert in child-abuse pediatrics, testified that she reviewed MC's medical records and determined that the initial history that was given was inconsistent with the severity of her brain injuries. She noted that there was a very significant skull fracture on the right side of MC's skull and a large area of bleeding on her brain that caused her brain

3

to shift within her skull. She said she would not expect a skull fracture of that magnitude to have been caused by a fall from a bed. The type of head injury that MC sustained was "not something that results from a fall of just the weight of the child themselves without something else, like somebody falling on top of them or them being propelled or being struck by something. . . . Or being, you know, struck forcibly with an object."

Chatman testified in his own defense at trial and offered a new account of events. He conceded that he lied to the police about what had happened and admitted that he had caused the injury to MC's head that caused her death. He recalled that MC was "crying and crying," so he picked her up to take her to the bathroom to wipe off her face. She "kept screaming and kept screaming," and he "kind of lost it for a second. I had her in my hands and she was yanking. She was jerking and everything. And so that is how it end[ed] up--the edge of the sink." He said that he shook MC "just for a split second," and when he shook her, "the back of her head had hit the edge of the sink." He explained that he was just trying to clean her face off and "she was jerking and everything . . . and her head end[ed] up hitting" the sink.

On cross-examination, Chatman agreed that MC hit the sink "pretty hard." He denied "slamming" her into the sink, however, saying he shook her and that she was "bucking" back and forth when the back of her head hit the sink. He repeatedly said that he did not slam her into the sink but that she hit her head as she was bucking. On redirect, he conceded that he was shaking MC when her head hit the sink.

After the defense rested, the State announced its intention to call Dr. Farst to rebut Chatman's account of what happened to MC. The State noted that Dr. Farst would testify that MC could not have propelled herself hard enough into the sink to cause the skull fracture and that it would "take some more significant volitional movement from the defendant." Dr. Farst would also clarify that shaking alone could not have caused MC's skull fracture. Chatman objected that Dr. Farst's testimony was not proper rebuttal. The court overruled Chatman's objection, however, commenting from the bench as follows:

> Sometimes rebuttal evidence may overlap the State's case in chief. However, it must be responsive to the defense['s] evidence. The defendant gave a new version of what transpired to explain how the circumstances existed at the time, how the injury occurred, and what he did, specifically, in his interaction with the child. This was not information that the expert [witness] had access to . . . at the time of her previous testimony. Therefore, the Court finds that based on that new evidence, the offer of the rebuttal testimony [is] within the character that Arkansas law allows. So I will allow Dr. Farst to testify to the things that [the State] indicated as rebuttal.

Dr. Farst then testified that Chatman's new version of events would not account for the injuries that caused MC's death. She said she heard Chatman testify that he was shaking MC while MC bucked her head back and hit the back of her head on the sink. She noted two things about Chatman's testimony that were inconsistent with the medical evidence: first, Chatman said that MC hit the back of her head, but the injury that caused MC's death was to the right side of her skull. Second, while actively shaking a baby can cause an injury, "shaking without having a very forceful kind of slamming impact where the child's head is propelled against the surface doesn't cause a skull fracture."

5

Dr. Farst added that a twenty-six-pound child could not generate enough energy on her own volition, "no matter how hard she is bucking or twisting," to hit her head hard enough to cause the injuries she sustained. It would have required "[Chatman's] energy propelling her head against the flat surface in order to have caused this."

At the conclusion of the trial, the jury acquitted Chatman of capital murder and first-degree murder but found him guilty of second-degree murder. Chatman timely appealed, and he now challenges the circuit court's decision to allow Dr. Farst's rebuttal testimony.

Genuine rebuttal evidence consists of evidence offered in reply to new matters. *Gilliland v. State*, 2010 Ark. 135, 361 S.W.3d 279. Evidence can still be categorized as genuine rebuttal evidence even if it overlaps with the evidence-in-chief. *Id.* However, the evidence must be responsive to that which is presented by the defense. *Id.* The scope of a rebuttal witness's testimony is accorded wide latitude. *Owens v. State*, 2017 Ark. App. 109, at 5, 515 S.W.3d 625, 628.   It is within the circuit court's discretion whether to admit rebuttal testimony, and the appellate court will not reverse this determination absent an abuse of that discretion. *Torres-Garcia v. State*, 2021 Ark. App. 174, at 15 (citing *Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996)).

Chatman concedes that prior to trial, the State was aware of only his custodial statements in which he denied hitting MC or otherwise causing her injuries. He further acknowledges that he changed his story and testified at trial that he shook her and that her head hit the sink while he was shaking her. He does not dispute that this testimony was a "new matter." He argues, however, that despite the fact that he testified that he caused the

6

injury, Dr. Farst testified in rebuttal that MC herself could not have generated enough force on her own to cause the injury. Thus, he contends, "the issue is not that [his] story changed at trial. Rather, the issue is that the State offered expert testimony to rebut a position that [he] never took on the stand."

In support of his argument, Chatman cites *Kincannon v. State*, 85 Ark. App. 297, 304, 151 S.W.3d 8, 12 (2004), for the proposition that the State "is not allowed to elicit testimony which necessitates rebuttal testimony." That is not at all what happened here. Dr. Farst's testimony during the State's case-in-chief was largely directed at disproving what Chatman had told the police in his statements––i.e., that MC hit her head when she fell from the bed. Dr. Farst testified that such a fall could not account for the severity of MC's injuries. After Chatman testified that MC's injuries occurred when she hit her head as she was "bucking" while he shook her, Dr. Farst returned to the stand to explain that this new version of events could not have caused MC's injuries either. She stated that neither Chatman's shaking MC nor her own momentum could have caused her head to strike the sink with enough force to cause the comminuted skull fracture and that it would have taken additional energy to propel her head into the sink with enough force to cause the fracture.

Genuine rebuttal evidence must be "responsive to that which is presented by the defense." *Gilliland*, 2010 Ark. 135, at 11, 361 S.W.3d at 285. There is no question that Dr. Farst's rebuttal testimony was responsive to Chatman's testimony. He offered a new explanation of how MC's injuries occurred, and Dr. Farst expressly addressed and contradicted that explanation. In ruling that her testimony would be admitted, the circuit

7

court acknowledged Chatman's "new version of what transpired" and recognized that Dr. Farst had not had access to that information when she first testified. The court considered the matter thoughtfully and ruled that this was proper rebuttal. We cannot say this ruling was an abuse of discretion.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.